UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LOUIE M. ROSALES,<br><br>    Plaintiff,<br><br>    v.<br><br>RICHARD V. SPENCER, Secretary of the United States Department of the Navy,<br><br>    Defendant. | CASE NO. C17-5781 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Richard Spencer's ("Government") motion for summary judgment. Dkt. 25. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On September 29, 2017, Plaintiff Louie Rosales ("Rosales") filed a complaint against the Government asserting a claim for breach of contract and retaliation. Dkt. 1. On May 11, 2018, Rosales filed an amended complaint asserting the same claims and adding additional requests for relief. Dkt. 13.

ORDER - 1

On March 27, 2018, the Government filed a motion for summary judgment. Dkt. 25. On April 15, 2019, Rosales responded. Dkt. 33. On April 19, 2019, the Government replied. Dkt. 36.

## II. FACTUAL BACKGROUND

Rosales has worked as a civilian employee of the Department of the Navy (the "Department") for nearly 37 years. Dkt. 34, Declaration of Louie Rosales ("Rosales Decl."), ¶ 2. Since at least the late 1990s, Rosales has worked in various positions as a shipfitter in Shop 11 at the Puget Sound Naval Shipyard in Bremerton, WA. *Id.* At all relevant times, Jeremy Feldbush ("Feldbush") was the Trade Superintendent for Shops 11 and 17 and Cassandra Pruitt ("Pruitt") was the Resource and Skills Manager for the non-nuclear trades in Shops 11 and 17.

On March 16, 2016, Rosales filed a complaint with the Department's Equal Employment Office ("EEO") alleging discrimination and harassment based on his race, ethnicity, and national origin. *Id.* ¶ 3. On March 20, 2016, Pruitt demoted Rosales from his position as a Work Leader. *Id.* ¶ 4. On August 15, 2016, the Department engaged in formal mediation with Rosales regarding his EEO complaint. *Id.* ¶ 5. Rosales asserts that he and Feldbush reached an agreement as follows:

> We reached a verbal agreement that the Department would do the following: (1) assign me a mentor; (2) promote me back to a Work Leader position, where I had been before Ms. Pruitt demoted me; (3) put me on a list to attend First Level Supervisor (1LS) training; and (4) restore 24 hours of sick leave I had used when dealing with the harassment and discrimination. Elizabeth Anderson ("Anderson"), who was a Human Resource Specialist, was not there when Mr. Feldbush and I agreed to the settlement terms.

*Id.*

On August 19, 2016, Rosales and his union representative, Mark Leighton ("Leighton"), met with Feldbush and Anderson to sign a written settlement agreement. When Feldbush and Anderson presented the draft, Rosales immediately objected to the provision stating that he would be promoted to Work Leader for only a temporary period that was not to exceed 120 days. *Id.* ¶ 6. Rosales asserts that the conversation was as follows:

> When I looked at the settlement agreement, it was different than what I agreed with Mr. Feldbush. Mr. Feldbush had agreed that I would be returned to a Work Leader position, but the document said that I would only be promoted as a Work Leader for 120 days. Mr. Leighton and I told Mr. Feldbush that a temporary promotion would not work because that is not what we agreed. Mr. Feldbush told me that he understood but that this was the only "legal" way he could put me back as Work Leader. However, he specifically promised that when the 120 days was over, he would personally select me from a certification list, or "cert," and that I would remain a Work Leader going forward. I believed Mr. Feldbush. Mr. Leighton told Mr. Feldbush that if he did not keep his promise, the union would sue on my behalf. Mr. Feldbush assured me again that he would personally make sure that I kept my promotion after the 120 days.

*Id.* Rosales signed the agreement, which provides as follows:

> The Agency agrees to:
> (1) Assign a mentor to Mr. Rosales within ten work days from the last signature of this Agreement.
> (2) Place Mr. Rosales on a temporary promotion to a WL-3820-10 Shipfitter Leader position, not to exceed 120 days. This action will be initiated by the shop within ten work days from the last signature of this Agreement.
> (3) Add Mr. Rosales to the wait list for First Level supervisor (1LS) training within ten work days from the last signature of this Agreement.
> (4) Restore 24 hours of sick leave (LS) that was used by Mr. Rosales on 1, 2, and 14 March 2016. This action will be initiated by the shop within ten work days from the last signature of this Agreement.

Dkt. 26-1 at 57. The agreement also included an integration clause stating that the written agreement represented the "sole and entire" agreement. *Id.* at 58, ¶ 6.

Following the settlement, Rosales alleges that he was subjected to improper retaliation. On October 3, 2016, Rosales reported for his standard shift, but he was reassigned to a higher-priority project in a different section of the shipyard. Rosales Decl., ¶ 7. To work on this project, Rosales needed to retrieve his hard-hat and gear (called personal protective equipment or "PPE") from his locker on the other side of the shipyard. *Id*. Rosales asked and received permission from his temporary supervisor Glenn Shurman to retrieve his gear. *Id*. Although Rosales declares that his PPE was "in his locker on the other side of the shipyard," *id.*, the final disposition states that Rosales got in his car and left the shipyard multiple times, Dkt. 26-4, ¶ 2. In his deposition, Rosales admitted that he never asked permission to leave the shipyard and that he only asked to get his equipment. Dkt. 26-1 at 46. Regardless of this discrepancy, Pruitt opened an official investigation into Rosales's departures from the shipyard.

On December 24, 2016, Rosales's temporary position as a Work Leader expired. Instead of selecting Rosales for a permanent position, Pruitt promoted seven other employees.

On March 16, 2017, the Department notified Rosales that it had approved Pruitt's recommendation that he be suspended based on the October 3, 2017 "AWOL" incident. Rosales Decl., ¶ 14. That same day, Rosales alleges that the Department also failed to offer him a ceremony for his thirty-five years of service. *Id.* Rosales, however, did

attend a subsequent awards ceremony and received his commemorative pin. Dkt. 32 at 3, ¶ 5.

On or about April 18, 2017, Pruitt recommended Rosales be suspended for two days because he missed a training. Rosales Decl., ¶ 15. Pruitt's supervisor rescinded the proposed suspension and cancelled the investigation.

On August 15, 2017, Rosales informed his direct supervisor, Joshua Harrell ("Harrell"), that he needed to leave his position to handle official EEO business. Rosales Decl., ¶ 16. Rosales left the shipyard and went home to use his personal computer and printer. *Id.* On September 20, 2017, Pruitt advised Harrell that he should start another Pre-Action Investigation over the time that Rosales spent doing EEO business away from the shipyard. *Id.* ¶ 18. She also proposed a three-day suspension. *Id*. On April 13, 2018, the Department issued a decision on the incident and suspended Rosales from June 6 to June 8, 2018. Dkt. 28-1. The decision states that Rosales received permission to work on his EEO business, but he did not receive permission to leave the shipyard. *Id.*

### III. DISCUSSION

A. **Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

B.    **Breach of Contract**

Rosales alleges that the Government breached the settlement agreement "by failing to cooperate in good faith with all efforts to implement the agreement including, but not limited to, assignment of a mentor, promised promotion, and training." Dkt. 13, ¶ 41. The Government argues that Rosales's claim fails because the Government did not breach the written terms of the agreement. Dkt. 25 at 14–16.

As an initial matter on this claim, neither party cites authority for which law governs the settlement. "Federal law governs the interpretation of contracts entered pursuant to federal law where the federal government is a party." *Chickaloon–Moose Creek Native Ass'n v. Norton*, 360 F.3d 972, 980 (9th Cir. 2004) (citing *O'Neill v. United States*, 50 F.3d 677, 682 (9th Cir.1995)). Its undisputed that the federal government is a party to the settlement, and it appears that the parties entered into the contract pursuant to federal law. *See* 29 C.F.R. § 1614.504 ("Any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the [EEO] complaint process, shall be binding on both parties."). Both parties, however, cite Washington law for some principles of contract interpretation and admission of parole evidence. *See* Dkt. 33 at 17; Dkt. 36 at 5–6. While this creates some confusion, the parties appear to implicitly agree that Washington law applies and, since the Court is unaware of an obvious conflict with federal law, the Court will apply Washington law.

The first issue is whether the settlement is fully integrated. "It is a question of fact whether the parties to a written agreement intend an integrated contract." *S.D. Deacon Corp. of Wash. v. Gaston Bros. Excavating, Inc.*, 150 Wn. App. 87, 93 (2009) (citing

*Emrich v. Connell*, 105 Wn.2d 551, 556 (1986)). *See also Olsen Media v. Energy Scis., Inc.*, 32 Wn. App. 579, 584 (1982) ("The determination of whether or not a merger of oral and written terms occurred is a question for the trier of fact.") (citing *Ban-Co Inv. Co. v. Loveless*, 22 Wn. App. 122 (1978)); Restatement (Second) of Contracts § 209 (1981), comment c ("Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence."). While boilerplate integration clauses can provide strong evidence of integration, they are not operative if they are premised on incorrect statements of fact. *Denny's Rests. v. Sec. Union Title Ins. Co.*, 71 Wn. App. 194, 203 (1993). A court may consider evidence of negotiations and circumstances surrounding the formation of the contract, and if the agreement is not completely integrated, additional terms may be proved to the extent they are consistent with the written terms. *Id.* at 202; *Emrich*, 105 Wn.2d at 556.

In this case, Rosales has submitted sufficient evidence to create a material question of fact whether the settlement was fully integrated. Although the contract includes an integration clause, Rosales declares that he reached an oral agreement with Feldbush that he would be permanently promoted back to the Work Leader position. Rosales Decl., ¶ 5. When the draft settlement did not include a permanent promotion, Rosales and Leighton objected. *Id.* ¶ 6. Rosales declares that Feldbush told him that the 120-day temporary position was the only "legal" way to promote Rosales and, at the end of the temporary assignment, Feldbush would personally select Rosales for a permanent position. *Id.* Feldbush testified that, based on his statement to Rosales, he gave Rosales reason to believe that Rosales would remain in the work leader position after the initial

120 days. Dkt. 35 at 9–10. While the Government relies on the fact that Anderson clarified the terms of the temporary promotion, it also concedes that Rosales testified that "he was not listening to her." Dkt. 25 at 6. The Court finds that this evidence creates a question of fact whether the settlement was fully integrated.

The Government, however, argues that even if the agreement was partially integrated, Rosales may not use parole evidence to establish a provision that is inconsistent with the written terms. Dkt. 36 at 6. The Court agrees with this proposition, but the Government has failed to establish an inconsistency between a 120-day temporary position and a permanent position at the end of that temporary position. For example, the settlement could have included a provision that Feldbush would personally select Rosales as a permanent Work Leader at the end of the temporary position and the provisions would be mutually exclusive on a temporal basis. Because an agreement regarding a subsequent permanent position does not conflict with the agreement for an initial temporary position, Rosales has submitted sufficient evidence to create a material question of fact regarding an agreed upon term that was not included in the written contract. Therefore, the Court denies the Government's motion as to Rosales's contract claim because material questions of fact remain for trial.[1]

---

[1] The parties also dispute other terms of the settlement, and the Government fails to establish that it is entitled to judgment as a matter of law as to any aspect of Rosales's contract claim. For example, there is a question of fact whether the Government performed the mentorship provision of the contract in good faith. Rosales asserts that "the Department reassigned [his] mentor within three months of the settlement band [sic] the mentor was never replaced." Dkt. 33 at 3. The Government responds that "the settlement agreement provided only that a mentor would be assigned, [sic] and did not specify how long the assignment would last, much less that the assignment would be indefinite," Dkt. 36 at 3, which, at the very least, evidences a small amount of indifference to faithfully performing this provision.

**C.     Retaliation**

There is a three-step burden-shifting framework for considering summary judgment in an employment retaliation case. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). To establish a triable issue, the plaintiff first must prove a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action[,] and (3) a causal link between the two." *Id*. Second, the burden shifts to the defendant to present a legitimate reason for the adverse employment action. *Id*. Third, the burden shifts back to the plaintiff to "demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id*. "Only then does the case proceed beyond the summary judgment stage." *Id*.

Although the Government does not challenge whether Rosales engaged in a protected activity or suffered an adverse employment action, it does challenge whether Rosales has established a causal link between the two. Under Title VII, "the standard for the 'causal link' is but-for causation." *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [defendant]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Gallagher v. San Diego Unified Port Dist.*, 668 Fed. Appx. 786 (9th Cir. 2016) ("Gallagher's evidence does not show that retaliation was *the* cause of the non-renewal of his anchorage permit, as the but-for test requires."); *Brenneise*, 806 F.3d at 473 ("there were many plausible explanations why the district may have [committed the alleged adverse action]. Retaliation was not one of them.").

1       In this case, Rosales's arguments regarding causation rely on authorities finding rational inferences based on the temporal proximately between the protected activity and the adverse action. Dkt. 33 at 20–21. However, all of Rosales's authorities predate *Nassar*, which altered the causation standard from moving force to but-for causation. If multiple reasons for the adverse action exist, it is difficult for a court to determine as a matter of law what reason is the moving force of the adverse action. Thus, the circumstances are sent to the fact finder for a determination of causation. On the other hand, if multiple reasons exist for the adverse action, it is less difficult to conclude that one of many alleged reasons is not the but-for cause of the alleged adverse action.

      Rosales cites *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1062 (9th Cir. 2013) for the proposition that an adverse action that occurs "four-to-five months" after the protected activity supports an inference of retaliation. Dkt. 33 at 21. The *Ellins* court, however, considered the evidence under the more lenient standard where a plaintiff could establish "that retaliation was a substantial or motivating factor behind an adverse employment action [by introducing] evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech . . . ." *Ellins*, 710 F.3d at 1062. Although the Ninth Circuit has not directly rejected the temporal proximity inference, the validity of such an inference is doubtful when considering whether the protected activity was the but-for, or sole, cause of the adverse employment action. For example, Rosales claims that, within 45 days from the settlement of his EEO claims, he "was subjected to discipline for an alleged AWOL incident that did not occur." Dkt. 33 at 21. Contrary to Rosales's assertion, the

determination whether he left the shipyard with or without permission was made by Todd Smith, who found and concluded in part as follows:

> 1. Per references (a) and (b), this notice serves to inform you of my decision regarding reference (c). Per reference (c) you were notified of the proposal to suspend you from duty for one calendar day for "Leaving the Shipyard Without Permission."
> 2. You were advised that full consideration would be given to any oral and/or written reply that you elected to present in response to the proposal. You and your representative, Mr. Shawn Rowan, presented reference (d) on 13 March 2017. During that meeting you clarified that you had initially been located at Condo 49, near Pier B, and went to your parked car on base to drive around, PSNS & IMF to the State Street gate to reenter the Controlled Industrial Area (CIA) and retrieve your Personal Protective Equipment (PPE). You then exited State street again and drove back around to return to Condo 49. You actually left the shipyard multiple times and you would not have been able to be easily located if you were needed during that time.
> 3. I have given careful and objective consideration to the information relied upon in support of the proposed action and your oral reply in making my decision. After considering all of the information before me, I find the charge in reference (c) is supported by a preponderance of the evidence and warrants discipline. Therefore, you will be suspended for one day.
> 4. On 3 October 2016, you were acting as stand-in supervisor for Mr. Matthew Aiken on the Connecticut Project. You were also working with Mr. Glen Shurman on a Ready Assessment Brief (RAB) for the Seawolf Project. At approximately 1545 you asked Mr. Glen Shurman, and not your second-line supervisor, if you could retrieve your PPE from the Connecticut project. You stated during the Pre-Action Investigation that you left the CIA to drive around and re-enter at another location to retrieve your PPE. You did not have permission to leave the Shipyard.

Dkt. 26-4 at 2–3. A full investigation with due process protections is fairly compelling evidence that an "AWOL" incident did occur. This is especially true when Rosales admits that he did not ask permission to leave the shipyard. Dkt. 26-1 at 46. Moreover, the temporal proximity between the protected conduct and this adverse action is meaningless when the Court is charged with determining the but-for cause of the adverse

action. In short, Rosales has failed to establish a prima facie case of retaliation on this issue because his "evidence does not show that retaliation was *the* cause [of the adverse action], as the but-for test requires." *Gallagher*, 668 Fed. App'x at 786.

Furthermore, Rosales's other alleged incidents of retaliation do not fare any better. Rosales's best evidence of retaliation is Pruitt's recommendation that Rosales be suspended for two days because he missed a training. Pruitt even testified that such a harsh punishment for Rosales's failure to attend was unprecedented and the only one she remembered when dealing with over 700 employees. Dkt. 35 at 25–26. Pruitt, however, further clarifies the decision as follows:

> As to the proposed suspension of Mr. Rosales on April 17, 2017, I had been informed by Mr. Rosales' second level manager, Robert Hannon, that Mr. Rosales missed his scheduled training. Mr. Hannon asked how they should proceed and I told him to discuss further with the supervisor on what actions they would like to take (conduct an investigation or not). The next day, I was informed that Mr. Rosales' first level supervisor, Tom Morrone, wanted to conduct a pre-action investigation, since he had reminded Mr. Rosales of the scheduled training a few times. According to my records, the pre-action for missing required training was conducted on March 22, 2017. Nobody was directed to conduct a pre-action. The supervisor determined that it was the best course of action. I supported it. The supervisor stated that he informed Mr. Rosales of the training a couple of times. The training was for a qualification (fit up) that we need our mechanics, especially more experienced ones, to maintain. According to the records, Mr. Rosales missed training on June 22, 2016, September 19, 2016, and March 3, 2017. He was on leave on June 22, 2016, but not the other days. The pre-action had nothing to do with his EEO activity. He missed training twice for a qualification (fit-up) that is essential to continuing to progress work. Part of my duties as resource manager for the shop is to review investigations and determine if discipline should be proposed. After evaluating the pre-action investigation and the statement from the supervisor, I decided that discipline was warranted. When evaluating the appropriate level of discipline to propose, I considered the fact that Mr. Rosales had just served a one-day suspension for leaving the Shipyard without permission. After considering progressive discipline, I

> recommended a two-day suspension. Progressive discipline is normal. This recommendation is consistent with other actions taken when misconduct occurs no matter what the reason. Other employees have received disciplinary action for missing training as well. After reviewing the matter, the deciding official decided to rescind the action and not discipline Mr. Rosales for missing the training.

Dkt. 32, ¶ 5. Rosales submitted no evidence to counter the details of this narrative. Thus, from an objective standpoint, Rosales knew he was under investigation for leaving the shipyard without permission, yet he missed a required and essential training for the third time. Then, when Pruitt evaluated the facts, she proposed the progressive discipline of a two-day suspension because Rosales had just served a one-day suspension for his prior "AWOL" incident. In light of these uncontested facts, Rosales has failed to establish that retaliation was the cause of Pruitt's *proposed* two-day suspension. Moreover, it is questionable whether a proposed disciplinary action is an adverse action. Rosales cites *Lytle v. Carl*, 382 F.3d 978, 986 (9th Cir. 2004), for the proposition that "instigating unwarranted disciplinary actions" is considered an adverse action. Pruitt, however, did not instigate the disciplinary action and Rosales fails to show that the investigation was in anyway unwarranted. Therefore, even Rosales's best claim for retaliation fails to pass the initial prima facie test.

Similarly, Rosales was not "demoted" from his Work Leader position because it was only a temporary position that had a known end date. Rosales also fails to establish that the failure to timely receive his anniversary pin was an adverse employment action. In fact, Rosales and other employees failed to get notice of the original ceremony, but the Department provided a second opportunity to attend a recognition ceremony. Dkt. 29 at

1. Finally, Rosales's second suspension was documented and based on him leaving the shipyard without permission. Thus, the Court finds that Rosales fails to establish a prima facie case of retaliation based on any alleged adverse action.

Even if the Court found for Rosales on the first prong of the burden shifting test, he fails to prevail on the other two prongs. The Government has set forth a legitimate reason for every alleged incident of retaliation. In turn, Rosales fails to show any pretext beyond his conclusory allegations that pretext exists. Dkt. 33 at 21–22. There is simply no evidence that Feldbush, Pruitt, or any other supervisor harbored an intent to retaliate against Rosales because of his EEO complaint. Therefore, the Court grants the Government's motion on this claim.[2]

## IV. ORDER

Therefore, it is hereby **ORDERED** that the Government's motion for summary judgment, Dkt. 25, is **GRANTED in part** and **DENIED in part** as stated herein.

Dated this 4th day of June, 2019.

BENJAMIN H. SETTLE
United States District Judge

---

[2] The Government also argues that Rosales failed to properly exhaust some of his retaliation claims, Dkt. 25 at 16–17, but the Court agrees with Rosales that his claim was triggered at the end of the 120-day temporary position, Dkt. 33 at 19.

ORDER - 15